J. P. SOUTHERN, EMPLOYEE, DECEASED, AND MRS. J. P. SOUTHERN ET AL.,
v. MOREHEAD COTTON MILLS COMPANY, EMPLOYER, AND MARY-
LAND CASUALTY COMPANY, CARRIER.

(Filed 27 January, 1931.)

1. **Master and Servant F i—Findings of fact of Industrial Commission
   are conclusive on courts when supported by sufficient evidence.**

   The findings of fact of a member of the Industrial Commission in a
   hearing before him under the Workmen's Compensation Act, approved by
   the full Commission upon appeal, is conclusive upon the courts when
   supported by any sufficient evidence.

2. **Master and Servant F b—Evidence held to support finding that death
   resulted from accident arising out of and in course of employment.**

   Evidence tending to show that an employee of a mill using water
   power had the duty of keeping the race at the dam on the employer's
   premises clear of obstructions for the continued or proper running of
   the machinery of the mill, and that he came to his death in assisting
   the removal of an automobile from the water during his working hours
   by being drowned in the fast flowing waters in the race, is sufficient
   evidence to sustain a finding of the Industrial Commission that his death
   was caused by an accident arising out of and in the course of his
   employment and awarding recovery to the claimant under the provisions
   of the statute.

APPEAL by plaintiffs from *Johnson, Special Judge,* at June Term,
1930, of FORSYTH. Reversed.

The findings of fact, as set forth by J. Dewey Dorsett, Commissioner:
"It is admitted and is a part of this record, and is now found as a
fact that the deceased met his death by accidental drowning while regu-
larly employed by the defendant employer; that his average weekly
wage amounted to $22.64 per week, that his wife, Mrs. J. P. Southern,
and minor children, Stanford, Elaine and Talmadge Southern, were at
the time of J. P. Southern's death and for the three months prior
thereto wholly dependent for support upon the deceased.

The owner of the mill has this to say: 'His duties (referring to the
deceased) consisted principally of making the rounds, but his duties
also consisted of helping raise and lower the gates to the dam, look after
the property around there and the tail race.'

Mr. Royster, the superintendent of the defendant employer, has this
to say: 'He made the rounds, punched the clock and fired; we were
carrying a light fire that night. He looked out for the property all
around, and in case anything got in the race it was his duty to get it
out, or to get some one else to help him to get it out, and he had charge
of the pour, together with the gates and race and anything around there.

If the water got too high and he couldn't raise the gates he would go in the mill and get people to help him or see the night foreman.'

'Q. Where were you at the time this accident occurred? A. I was at supper. My son called me and said the overseer had asked him to call me—that an automobile had run in the pond and that they would have to drain it to get it out, and that we would have to shut down the mill for three nights after that. I jumped in my car and rushed over to the mill.'

The superintendent testified that he thought the deceased was under the impression that the car was full of folks, and further that he did not know that any one had ordered the deceased to jump into the canal for the purpose of rescuing the folks in the car.

Mr. Royster, the superintendent, was asked this question: 'Q. Would you consider his going into the pond to rescue this man in his line of duty? A. The only way I could consider it in that light was that he knew that if something weren't done—if he didn't get the car out it would interfere with the running of the mill; that if the water all run they would have to shut down the mill. I don't know whether he knew we could run without that water, but such was the case. If he didn't, he would do all he could to help the mill folks get started up. We met Mr. Mizelle and told him that the water would have to be drained off, and the only way to do it was by raising the gates and that's what he did. He had all the water cut out. Then they could get the car out before the water was put in again. Mr. Southern was a man that would do anything to keep his job going, and maybe he construed it to be in his line of duty to help get the car out and get the people out. He wanted to keep from having to drain it next day, and get it out so the mill could start up work. He might have construed it in that way.' The superintendent further testified that it was a part of the deceased's duties to keep the pond clean, and was asked this question: 'Q. As a matter of fact, if he had been assisting in getting the automobile out so the gates could be lowered he would have been assisting the company in keeping the water up so the boilers wouldn't run low? A. Yes, sir. Q. The quicker the automobile was gotten out the quicker the gates could be lowered, and it was to the company's interest if he did this so the boilers would not have gotten too low? A. Yes, sir.' Mr. Royster was asked another question: 'Q. If he jumped in, Mr. Royster, in your opinion wasn't it in the discharge of his duties in looking after the company's property, and wasn't he right there at that particular time to see about the water? Didn't he go in there to get the automobile out to enable you to fill the boiler more quickly so the mill could continue running? A. Yes, sir, he could have been of assistance, of course, and the gates could not be dropped until the automobile was gotten out. I

think he was aiming to go over there and help until they found the body and get the automobile out.'

Counsel for the defendants asked this question: 'Q. In your opinion was his primary purpose to save the man or to disregard the man and try to keep the mill going? A. Well, knowing the man as I did—he had a rather nervous disposition, and I think Mr. Southern was highly excitable—he was always a man that was fond of working, and he always wanted to help somebody, and he would go through the mill and see somebody that needed a lift and would help him; he was always a man to give somebody a lift, and I think his whole-soul purpose was to get to the car, and get the car out, and help rescue somebody or ascertain if he could lower the gates. Q. His main purpose was to save a life? A. That's my honest opinion as to why he did that. Q. Would the car in the canal have interfered with the operation of the mill? A. Well, no, provided we didn't let the water out. Q. You were anxious that the car be gotten out? A. I stayed there until midnight to do it. Q. Would you have directed your men to get the car out had you been there? A. Yes, sir, I would have proceeded to have gotten it out as quick as I could so we could let the gates down.'

The superintendent was asked this question: 'Q. Was it in the line of his duty as night watchman; that is, do you consider it a part of his duty to superintend and help get the car out of the canal? A. If there was any trouble, or anything happened down there, he went to the night overseer if it was anything he could not handle. I suppose he was under the impression that they could hold him responsible for the water. Q. As superintendent you were interested in the removal of the car and the parties in the car? A. Yes, sir. Q. Did any of your other employees go into the water to get the car out, that you know of? A. No, sir, we got a garage man to get it out.'

In view of the foregoing we make the further finding of fact that J. P. Southern met with an accident arising out of and in the course of his employment upon the premises of his employer which resulted in his death."

### AGREED STATEMENT OF CASE ON APPEAL.

The action was originally commenced before the North Carolina Industrial Commission and arose out of a claim for compensation on account of the death of the said J. P. Southern, who was fatally injured while in the employ of the defendant, Morehead Cotton Mills Company.

The case was first heard before Hon. J. Dewey Dorsett, of the North Carolina Industrial Commission at Wentworth, North Carolina, on 30 October, 1929. Commissioner Dorsett filed an opinion in said case in which he sustained the contentions of the plaintiffs that said

accident arose out of and in the course of the employment and made an award in favor of said plaintiffs for compensation at the rate of $13.58 per week, payable weekly, for a period of 350 weeks; and funeral expenses not to exceed $200.

On 6 November, 1929, the defendants appealed from the award of Commissioner Dorsett to the full Commission. The case was heard before the full Commission on 19 November, 1929, and thereafter, an opinion for the full Commission was filed by Chairman Matt H. Allen, in which the findings of fact and award of Commissioner Dorsett were adopted and affirmed.

Thereafter on 16 January, 1930, the defendants gave notice of appeal from the aforesaid award of the full Commission to the Superior Court of Rockingham County, and the same was transferred for trial to the Superior Court of Forsyth County, where the same was heard on said appeal before his Honor, T. L. Johnson, at the June Term, 1930, of the Superior Court of Forsyth County. Judge Johnson rendered judgment, denying compensation to plaintiffs, overruling and setting aside the award originally made to them by Commissioner J. Dewey Dorsett and approved by the full Commission, and expressly adjudged that the accident did not arise out of the employment of J. P. Southern.

It is admitted that at the time of his death the deceased was in the employ of the defendant, Morehead Cotton Mills Company, and it is the contention of plaintiffs that the injury resulting in the death of the deceased arose out of and in the course of his employment, while the defendants deny this contention, and contend that such injury did not arise out of the employment of the said J. P. Southern. It is further admitted that the employer and the deceased employee, at said time, were subject to the provisions of the North Carolina Workmen's Compensation Act, and that the average weekly wage of the deceased, at the time of his death, was $22.64.

To the judgment of Judge T. L. Johnson, setting aside the award made by the Industrial Commission to the plaintiffs, plaintiffs duly excepted, assigned error and appealed to the Supreme Court.

Opinion, in part, of full Commission: "Commissioner Dorsett, upon all of the evidence, reached the conclusion that the accident did arise out of and in the course of the employment, and has sustained this position in an able opinion filed with the Commission. This Commission, after careful consideration of all the evidence and the arguments and briefs of counsel for plaintiff and defendant, hereby agrees to and adopts the findings of fact, award, and opinion made therein, and accepts said findings of fact, award, and opinion as the findings of fact, award and opinion of the full Commission. Matt H. Allen, Chairman."

*Stipulation:* "It is further agreed that the findings of fact by the Commissioner are in accordance with and are supported by the evidence, except that part of findings of fact reading as follows: 'In view of the foregoing, we make the further finding of fact that J. P. Southern met with an accident arising out of and in the course of his employment upon the premises of his employer, which resulted in his death.' "

*Fagge & Walker for plaintiffs.*
*C. O. McMichael, Sr., for defendants.*

CLARKSON, J. The decision of this action is found in advance sheets of opinions in cases heard and determined by the North Carolina Industrial Commission, Vol. 1, No. 5, p. 200. The findings of fact and conclusions of law by J. Dewey Dorsett, Commissioner, are not set forth in the above published opinion.

Sec. 2 (f) of the North Carolina Workmen's Compensation Act reads as follows: " 'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident."

In *Johnson v. Hosiery Co.,* 199 N. C., at p. 40, it is said: Sec. 2(b) "undertakes to define the word employment and specifically excludes from the operation of the act 'persons whose employment is both casual and not in the course of the trade, business, profession or occupation of his employer,' etc. . . . It is further provided in section 60 that the award of the Commission 'shall be conclusive and binding as to all questions of fact.' However, errors of law are reviewable. It is generally held by the courts that the various compensation acts of the Union should be liberally construed to the end that the benefits thereof should not be denied upon technical, narrow and strict interpretation." *Rice v. Panel Co.,* 199 N. C., at p. 157.

The Commissioner, Dorsett, found: "In view of the foregoing we make the further finding of fact that J. P. Southern met with an accident arising out of and in the course of his employment upon the premises of his employer which resulted in his death." The full Commission, upon appeal, sustained this finding of fact.

In the present action there was sufficient evidence to sustain the finding of the Industrial Commission. We think the finding borne out by the weight of authority.

In *Indemnity Co. v. Scott,* 278 S. W., at p. 348 (Texas): "The finding of the court in.favor of appellees being general, every issuable fact must be considered found in their favor if there is any evidence to support such a finding. In passing upon the sufficiency of the evidence to

sustain each such finding, we must view the same in the light most favorable thereto, rejecting all evidence favorable to the opposite contention, and considering only the facts and circumstances which tend to sustain such finding." S. C., 298 S. W., 414 (Texas).

In *Pekin Cooperage Co. v. Industrial Com.*, 285 Ill., 31 (120 N. E. Rep., at p. 531): "Our consideration of the evidence is limited to the inquiry whether the record contains competent evidence to sustain the award. If the evidence in favor of the applicant sustains the award, the weight of the evidence to the contrary will not be considered by the reviewing court. The determination of the facts upon contradictory evidence by the Industrial Commission is final." *Kuca v. Lehigh Valley Coal Co.*, 110 A. R., 731 (268 Pa., 163); *Chicago Dry Kiln Co. v. Industrial Board*, 276 Ill., 556.

In *Baum v. Ind. Com.*, 288 Ill., 516, 6 A. L. R. Anno., at p. 1247: "While compensation under the statute ordinarily is not recoverable unless the injury arises out of the employment, the cases, almost without exception, hold that an employee does not go outside his employment if, when confronted with a sudden emergency, he steps beyond his regularly designated duties in an attempt to save himself from injury, to rescue another employee from danger, or to save his employer's property." *Dondenean v. State Ind. & Acci. Com.*, 119 Ore., 357, 50 A. L. R. (Anno.), p. 1148. "By accident arising out of and in the course of the employment" see definition given in *Conrad v. Foundry Co.*, 198 N. C., 723. *Harden v. Furniture Co.*, 199 N. C., 733; *Phifer v. Dairy, ante,* 65; *Davis v. North State Veneer Corp., post,* 263.

In the present case there is no dispute that the employee was on duty on the defendant's mill property as night watchman at the time of the accident, and had been for years in the employ of defendant as night-watchman. His conduct just prior to the accident was all in furtherance of his employer's business. It was necessary to safely run the machinery in the mill that the gates be down, but the gates were raised after the man plunged in the race in his machine, and could not be dropped until the automobile was gotten out. Every effort was made to get the automobile out, and a few hours after Southern was drowned it was gotten out so that the mill could run. The conduct of Southern undoubtedly leads to the conclusion that he went in the race to get the automobile out and miscalculated the swiftness of the current. He often cleaned out debris in the race before, and his wife said that he stated on one occasion before, "This is my job getting planks and things out of the race." This faithful employee, in performing a hazardous duty, to protect his employer's property and keep the mill running, lost his life by accidental drowning. It was "an injury by accident and arising out of and in the course of the employment." The Commission so

found, and there was competent and sufficient evidence to support the finding. The deceased belonged to that noble army of workmen who serve their employers faithfully and not by "eye service," and in attempting to save the property of his employers, accidentally lost his life and left dependent a wife and children. The beneficent purpose of the act was that industry would care for the widow and orphan in such cases as the present.

The case of *Davis v. North State Veneer Corp., post,* 263, is clearly distinguishable. The judgment of the court below is

Reversed.