WINBORNE, J., took no part in the consideration or decision of this case. *Page 101 
This is a proceeding under the North Carolina Workmen's Compensation Act. The plaintiffs filed claim against the defendants for compensation on account of the death of Wesley Williams, alleged to have occurred as result of injury, alleged to have been received by accident, and alleged to have arisen out of and in the course of his employment by the McDowell Furniture Company of Marion. This defendants denied.
After notice to the parties, said proceeding was heard before Commissioner T. A. Wilson, at Marion, on 3 December, 1936, and thereupon said Commissioner made certain findings of fact upon the evidence presented before him on said hearing and entered an award in said proceeding in favor of the defendants and against the plaintiffs as claimants.
The plaintiffs appealed from said findings of fact and award so made by Commissioner Wilson and said appeal was heard by the Full Commission, sitting in Raleigh, North Carolina, on 23 March, 1937, and said Full Commission, pursuant to such hearing on appeal, rendered decision reversing the decision of Commissioner Wilson and rendering an award in favor of the plaintiffs. The defendants gave due notice in apt time of appeal from said decision and award, and appealed from the Full Commission to the Superior Court of McDowell County. The proceeding was certified to the Superior Court of McDowell County and the record so certified was docketed in apt time in the Superior Court of said county. The appeal so taken was heard by his Honor, John H. Clement, Judge presiding, at the June Term, 1937, of the Superior Court of McDowell County, who rendered judgment thereon affirming the decision and award of the Full Commission, from which judgment so entered by the judge presiding at said term the defendants excepted and assigned error and appealed to the Supreme Court.
Admissions: The defendants admit that Wesley Williams died on 19 July, 1936; that at the time of his death he was foreman of the glue room of the McDowell Furniture Company, but deny that he was on duty at the time of the accident which resulted in his death. It is further admitted that said Williams received injury in an automobile wreck in Catawba County on No. 10 Highway; and that he died as result of the injury. It is admitted that the McDowell Furniture Company was bound by the Workmen's Compensation Act, and that the Consolidated Underwriters is the carrier. It is further admitted that the average wage exceeded the maximum and was, in fact, $31.88 a week. It is further admitted that S. B. Hildebrand was duly appointed administrator in August, 1936, and is duly qualified. *Page 102 
There are certain facts not disputed on the record. That the Southern Furniture Exposition Building, at High Point, N.C. on 18 July, 1936, was preparing to open for its annual display on Monday, 20 July, 1936. The primary purpose in having these expositions was for wholesale only to furniture dealers over the United States. It invited the buyers to come in and see what it offered and get their orders. The furniture exhibit that came from McDowell Furniture Company was finished product. It went there crated. There were about 175 exhibitors. The finished product from the respective furniture factories only were displayed. This display was on the 7th floor.
C. E. Bolick since 1928 has been superintendent of McDowell Furniture Company. E. C. Terry was foreman of the finishing room, Wesley Williams, the deceased, was foreman of the glue room, B. T. Ragan was foreman of the machine room. Bolick left the McDowell Furniture Company factory about 11:00 o'clock with one Foster, the lumber inspector, for High Point. He testified, in part, that he took some tools. In assembling the exhibit it is necessary to have tools. He got a couple of men from the exhibition organization office to go up and help him assemble the furniture for display. He was in the exhibition building about an hour Saturday evening and 30 or 40 minutes next morning, and left High Point about 4:00 o'clock that afternoon. Bolick further testified, in part: "A glue room man, by looking at other exhibits of furniture, cannot get ideas which might help him in properly matching boards or veneer for the samples, for the simple reason that the designs are designed by our own designers and factory. We have our own specifications and looking at another suit wouldn't help. It wouldn't help him in the construction of a piece of furniture." On his way to the exhibit space on the 7th floor, Bolick met Terry, Horton, Ragan, and Williams, who stayed about 35 to 40 minutes. He made reservations in the hotel for these men. "I didn't have a reason for asking him (Williams) to go to High Point. I paid his expenses. I couldn't see why it would be of some benefit to the company to have him go, because we buy the details for him to work by entirely. . . . In answer to your question, `Why did you offer to pay the expenses?' I say, giving the boys a little outing. When I first asked Williams to go, he said he didn't know whether he could go or not. I told him I would like for him to go. This was the last time I saw him until I got down there. . . . Wes Williams was the foreman in the glue room. He was working by the hour. His work week began Monday morning and ended at 12:00 o'clock on Saturday — 45 hours a week. When the time for the furniture show approached, Ed Terry told me that he and Vince Horton wanted to go down there to High Point. I said, `All right, if you go I'll go with you. I've got to go down there. I'll go with you.' *Page 103 
After I told Terry this I thought about the other foremen and invited them to go, if they wanted to. I felt like if I was to go down there with Horton and Terry, the rest of them would feel like I hadn't been fair and given them the opportunity to go, so I invited them to go. I didn't take any of them to do work. . . . I did not allow Williams any pay for the time he was off down there. I did not give Williams any order from the time he left Marion until the time he got back. I invited Williams that morning to go. . . . I was extending a courtesy to the folks at the plant; that is the idea exactly. When I left here I didn't know that Williams was going at all. When I went to the hotel there I asked the man to hold two rooms until the other automobile came, because I didn't know whether two or three or four were coming. I didn't know Bill Ragan was coming, nor did I know that Wes Williams was coming. . . . I had sent our samples down there by freight motor express. The samples were crated up at the factory. When I got down there these samples were in our space. All that I took in the automobile were two or three side bed rails. I took them up to the space myself. Foster and I. Then I got two men to come in there and set up the furniture for me. . . . I told these two men whom I got from the exposition building how I wanted it arranged and set about there. I did not give any directions to Williams, Ragan, Ed Terry, or Vince Horton as to how it should be set up. Foster drove his car. I went with him. I didn't pay him anything for driving his car. I paid the hotel bill. Before Williams left there he paid me back. He came into my room and throwed $5.00 down on the table and said, `There's my hotel expenses.' . . . Mr. Crisp of McDowell Furniture Company always gives me an expense check when I go off on trips. I used that. I paid all the hotel expenses. I bought some gas with my own money. Of the $5.00 which I told Mr. Winborne, Williams put down in the hotel room, I did not give him any change. I told him to go ahead and keep that, I'll pay the expenses, and he says, `No, that will pay for me,' and he would not have it back. None of the other men repaid me for the expenses. The $5.00 was $2.50 too much. That was not repaid. . . . I know I didn't pay for all the meals. I paid for a few of them. . . . It was not any part of Williams' employment that he should attend the furniture show. I employed him. I hired him and when I hired him there wasn't a word said about him going to the furniture show. I never did tell him that as a part of his work there he was to go to the furniture show. The only reason he went this time was merely for his own personal pleasure. . . . The first time he went was back when we first started operations, and at that time, about 1930, business got a little dull and we weren't running the week-ends. *Page 104 
My wife wanted to go and I invited him to go with us. I took him along to help drive. He went as my guest."
E. C. Terry testified, in part: "I was not employed by the McDowell Furniture Company on 18 July, 1936. I was employed until noon on 18 July, 1936. I was employed as foreman of the finishing room. . . . I asked him (Bolick) — told him I wanted to go to the show. . . . I left for High Point about 12:30 on Saturday, 18 July, in my own car. Q. Had you been told by the superintendent, Mr. Bolick, before you started, what would be done about paying the expenses to High Point? Ans.: Mr. Bolick told me if I wanted to go, to take my car, some of the other boys were going, to get some gas up at the company's store, and they'd make arrangements with me to go, so I didn't know how many were going; it would be perfectly all right with them. Q. Did he say he would pay the expenses of the trip? Ans.: Yes, sir. Q. Did the McDowell Furniture Company pay the expenses of the trip? Ans.: Well, they paid part of it. They paid for the gas down there and the hotel bill. I paid for the oil. I went in an Essex Terraplane. Q. Give us the names of all the employees of the McDowell Furniture Company you transported to High Point? Ans.: Bill Ragan, Vince Horton, and Wesley Williams. Bill Ragan was machine room foreman; Wesley Williams was the glue room foreman. We traveled U.S. Highway No. 70, going to High Point. It used to be Highway No. 10. We reached High Point about 5:30. After we got to High Point we went up to the Southern Furniture Exhibit Building and stayed, I guess, thirty minutes. We did not do anything when we got there. Wesley Williams went up into the exhibit building. I left the building and did not return until Sunday morning about ten o'clock. Wes Williams was with me when I returned. We stayed in the building about 20 or 30 minutes Sunday morning. Looked around at some of the samples of the furniture of other people as well as our own. Wes Williams was with me. Q. What were you observing the samples for? Ans.: Looking over them to see the different finishes was what I was looking for. I did not again return to the building. The show was to commence Monday, 20 July. Mr. Ragan, Mr. Horton, Mr. Williams, and I left High Point about 2 o'clock on Sunday, 19 July, 1936, in my car. Williams was driving. We traveled No. 70 Highway coming to Marion. We had an accident that afternoon about a quarter of a mile east of Conover. Williams was driving at the time. The tire bursted and the car got to going across the road and turned over. The rear tire blew out. . . . When we went down to High Point we didn't expect to find any glue room in connection with the exposition. . . . All I expected to see when I went down there was the finished product. . . . There was nothing down there that would help a man operate *Page 105 
a glue room. It would not be any advantage to a man operating a glue room to see the finished product. . . . The work week at the factory began on Monday and ended Saturday at noon. When I left the factory that day I left after the work week was over. I do not know how Wesley Williams was paid; whether by the week or by the hour. Wesley Williams left there with me after the work week was over. I was paid by the week. I did not receive any extra pay for the time that I was away from Marion going on that trip. In High Point I stopped at the hotel. Mr. Bolick paid for my meals; that is what I ate while I was down there. He paid my hotel bill. I was present up in Bolick's room before we left High Point. Wes Williams went up there with me. While up there in the room, Wes Williams laid down five dollars and said, `That will pay for my hotel bill.' . . . In other words, this was, so far as I was concerned, an outing. I understood that this is what we were all going on, merely an outing. I didn't go down there to do any work. All of us put on our Sunday-going-to-meeting clothes, what we had — in other words, we were all dressed up and weren't in working clothes. . . . I told you a while ago that I could go wherever I pleased, and was not under the direction of anybody. I didn't understand when I told him that Mr. Bolick was directing me while in High Point. I was not under orders from Mr. Bolick while I was down there. I was my own boss, could go wherever I pleased and come whenever I pleased. I was not under the direction of anybody."
B. T. Ragan testified, in part: "I went to High Point for the pleasure of the trip. Nobody asked me to go. In answer to your question, `Well, how come you to start?' I say, Mr. Bolick told me some of the boys were going and said all of us that wanted to go, they'd be glad for us to go along. He told me this about 9 o'clock on the 18th. He said that Terry and Horton were going and taking Terry's car and would be glad to take all that wanted to go. Q. Did he not state expenses would be paid? Ans.: Yes, sir. I saw Wesley Williams on Saturday morning before we left for High Point. Saw him at different parts of the plant. He said he didn't think he'd go — said it was hot down there and he had a date with his girl — didn't think he'd go. He did not tell me who asked him to go; said some of the boys were going but he didn't believe he would go. I don't know the exact time of the morning he said that. It was 9 or 10 o'clock. We left for High Point about 12:30 or 1 o'clock, somewhere along there. I went with Mr. Terry. Williams also went. I went into the Furniture Exhibit Building while I was there. Terry, Horton, Bolick, and Williams were with me. This was around 5:30. I did not do anything after I got to the building. I went up into the space occupied by the McDowell Furniture Company. Found the samples in the space. They had not been set up. While in the building I *Page 106 
did not look at any other exhibits. I stayed in the building 35 or 40 minutes. I consumed the time while in there just talking and walking around. I went on only one floor, the seventh. I did not go back to the building Sunday morning. I was one of the men in the car when it turned over. . . . It was not part of my employment to go down there to see the furniture. There wasn't any machine room on exhibit down there to show me how the machine room was operated in other factories. There was not anything in connection with the finished goods down there that would better enable me to run my machine room in the McDowell Furniture Company. When I got down there I went up to the building and stayed around there 35 minutes and then went on out. I just went where I pleased and when I pleased. I was not under any orders from anybody as to what I should do, where I should go, and when I should come in. I roomed with Wes Williams down there. I know that Wes Williams wasn't under any orders to go and come at any particular time or place. . . . I was going merely on a pleasure trip and not to do any work. The purpose of the trip was merely for pleasure. That was the purpose of all of us in going. I wasn't in the room in High Point when Wes Williams put down the five dollars to pay his expenses. When I ate down there I paid my bill and his part of the time and he paid for mine and his both part of the time. He and I ran around together most of the time. . . . I had gone with Mr. Bolick twice before this. I did not go down there to work on the other occasions. I got no extra pay for the trip. . . . I didn't take my working clothes with me. He didn't take any with him. There wasn't anything down there in the furniture exposition that would help me in the operation of my machine room. There wasn't anything in connection with it to help a man operate the glue room. There wasn't anything in connection with it that would better help a man in the packing room as to how to pack up stuff. There wasn't an exhibit of that kind down there. There wasn't an exhibit of a cabinet room nor a finishing room. The only thing were was finished goods. I, too, got hurt on that trip in the same accident. I was paid by the week, 45 hours a week. I did not get any extra pay for overtime. If I worked overtime I got pay for a week of 45 hours. Sometimes I did work overtime and I didn't get any pay for that. Those in our group left High Point before Mr. Bolick. We checked out first. I did not pay any hotel bill. Mr. Bolick paid it. I was not under the direction of anybody while I was down there. Nobody gave me any orders. I went just for the trip. As to your request that I state to the court some kind of pleasure I went down there for, well, that is my home town. I was raised down there, for one reason. Know a lot of folks down there, and like to be with these boys going down and coming back. That's about all. Over at *Page 107 
the factory Wes Williams worked by the hour. His work week was 45 hours, beginning on Monday morning and ending Saturday noon — 12 o'clock."
Clifton Byrd testified, in part: "I have been employed by the McDowell Furniture Company about 8 years, in the glue room under Wes Williams. I remember his leaving the plant that day, about 11:30, the last time I saw him, when I saw him go out of the shop. He came back into the shop. After he went out it was about fifteen minutes before he came back. I don't know how long he stayed. I don't know when he left the glue room the last time to go to High Point. I had a conversation with Wes Williams that morning. He told me he was going to High Point. He told me about 11 o'clock he was going to High Point. Q. You know who he left in charge of the glue room? Ans.: He left me. I worked that day until 3 o'clock. I worked after dinner. Me and one other fellow that works in the glue room worked that afternoon. Some eight or ten, I don't know exactly how many, of Wes Williams' men worked that afternoon on chair backs. Got a special order and I was not in charge of all these men; only me and that fellow. He told me to look after that end of it while he was gone. . . . We quit at 3:00 or 3:30. I got paid for work that afternoon. Wes Williams didn't tell me what he was going to High Point for. Nobody marked up the time that afternoon. I punched my card. Each man is supposed to punch his own card. Q. Well, do you or not, in the glue room there, often work overtime? Ans.: Yes, sir, we do. Every night or two some of them work overtime. Q. And whenever men work overtime, prior to the death of Wes Williams, would he be there or not? Ans.: He was when he was there. He was there when I worked overtime. Q. Performing his duties as foreman? Ans.: Yes, sir, he was. Q. Williams delegated all his duties to you, did he not? Ans.: Yes, sir. Wesley Williams did not keep the time of the men when he worked overtime. I do not know whether he received pay. I have never been to the furniture show. My work week began Monday morning and ended at 12 o'clock Saturday. I was paid by the hour. If I worked overtime I was paid by the hour. That was the rule there in the factory."
Fred Mathis testified, in part: "I was working for the McDowell Furniture Company in July, 1936, in the veneering and glue room department. Wes Williams was my foreman. The last time I had been working in that department for about 7 years under him. On Saturday, 18 July, I quit work at around 3:30. There were two men who worked in the glue room after dinner. In the veneer there were sometimes seven or eight, maybe more. Wes Williams had charge of them that morning before noon. He left for High Point at 12:25 to be prepared *Page 108 
to go. He left some few minutes after 11 o'clock. I had a conversation with him before he left. He told me he was going to dress to get ready to go to High Point. Had me to look after the veneering department while he was gone to dress. He didn't say what he was going to High Point for. He didn't say how he was going. Q. Who did he say asked him to go to High Point? Ans.: Said Mr. Bolick asked him to go. He said he didn't much want to go because he had a date with his girl. He came back in a few minutes and told me he was going. We very often worked overtime. As to how much, that all depends on what we had to do. We worked sometimes at night. Wesley Williams was not there all the time when we worked overtime. As a general rule, he was in and out. He generally told us what he wanted us to do. As a general rule he would not be there when we checked the clock. He told me he had a date Saturday afternoon. I was at the funeral. The furniture company closed down for the funeral. I talked with Wes Williams a few minutes after 11 o'clock and then about 11:30 that morning. A little after 11:00 he told me he didn't know whether he was going or not; that he had a date with his girl that afternoon. I was paid by the hour."
Paul W. Casey testified, in part: "On 18 July, 1936, I was the secretary and general manager of the Southern Furniture Exposition Building at High Point. . . . In July, 1936, the McDowell Furniture Company of Marion had rented space in the exposition building, under contract which began 1 December, 1935, and expired 1 December, 1936, and at $600.00 per year. The space was on the seventh floor. The McDowell Furniture Company used this space to display merchandise in. We have a show twice a year — January and July. The show started on 20 July. It takes two to four weeks to get ready for it. The merchandise is shipped in for a month in advance of the market. The McDowell Furniture Company put on an exhibit in our building at the time, commencing 20 July, 1936. By exhibit, I mean furniture, whatever they manufacture, samples of the manufactured furniture. They exhibit for wholesale purposes. Buyers attend the show, and observe the furniture. . . I know that Bolick was with the company. I saw the men in the McDowell space Sunday morning somewhere around 10 or 11 o'clock. I saw Mr. Bolick. I think it was around 11 o'clock when he left our building. Q. I believe, Mr. Casey, that these gentlemen from the McDowell Furniture Company had you to employ a couple of men to assist them there, is that so? Ans.: Yes, sir, his representatives. Mr. Bolick asked for men and they were sent to the space. . . . In other words, the processes through which the furniture moves in manufacture are not exhibited, but only the finished product after it has gone through all these departments in the respective furniture factories." *Page 109 
The question involved: Is there any sufficient competent evidence to support the finding of the Industrial Commission that the death of claimant's deceased, Wesley Williams, was caused by accident arising out of and in the course of his employment? We think not.
In Conrad v. Foundry Co., 198 N.C. 723, it is written (at p. 725): "The Workmen's Compensation Law prescribes conditions under which an employee may receive compensation for personal injury. Section 2 (f) declares that `injury and personal injury shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except when it results naturally and unavoidably from accident.' The condition antecedent to compensation is the occurrence of an (1) injury by accident (2) arising out of and (3) in the course of the employment. . . . (p. 727): An accident arising `in the course of' the employment is one which occurs while `the employee is doing what a man so employed may reasonably do within a time during which he is employed and at a place where he may reasonably be during that time to do that thing;' or one which `occurs in the course of the employment and as the result of a risk involved in the employment, or incident to it, or to conditions under which it is required to be performed.' Bryant v. Fissell,84 N.J. L., 72, Anno. Cas., 1918 B, 764; Marchiatello v. Lynch RealtyCompany, 94 Conn. 260, 108 A. 799. One of the risks involved in the employment is the liability of injury inflicted by fellow servants.Anderson v. Security Bldg. Co., supra (40 A.L.R., 1119). So it has been stated as a general proposition that the phrase `out of and in the course of the employment' embraces only those accidents which happen to a servant while he is engaged in the discharge of some function or duty which he is authorized to undertake and which is calculated to further, directly or indirectly, the master's business. Annotation — Workmen's Compensation, 1916 A, 41; Darleth v. Roach Seeber Co., 36 A.L.R., 472." The principles set forth in the above case have been approved by this Court in numerous decisions.
It is said in Bellamy v. Mfg. Co., 200 N.C. 676 (678): (Under the Workmen's Compensation Act) "It is the well settled rule of practice in this jurisdiction, in cases of nonsuit and cases of this kind, that the evidence which makes for the plaintiff's claim and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and she is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom." *Page 110 
In Southern v. Cotton Mills Co., 200 N.C. 165 (169), we find: "InJohnson v. Hosiery Co., 199 N.C. at p. 40, it is said: `Sec. 2 (b) undertakes to define the word employment and specifically excludes from the operation of the act "persons whose employment is both casual and not in the course of the trade, business, profession, or occupation of his employer," etc. . . . It is further provided in section 60 that the award of the Commission "shall be conclusive and binding as to all questions of fact." etc. However, errors of law are reviewable. It is generally held by the courts that the various compensation acts of the Union should be liberally construed to the end that the benefits thereof should not be denied upon technical, narrow, and strict interpretation. Rice v. PanelCo., 199 N.C. at p. 157."
In Dependents of Poole v. Sigmon, 202 N.C. 172 (173), we find: "The findings of fact made by the North Carolina Industrial Commission, in a proceeding pending before the said Commission, are conclusive, on an appeal from said Commission to the Superior Court, only when there was evidence before the Commission tending to show that the facts are as found by the Commission. Otherwise, the findings are not conclusive, and the Superior Court, on an appeal from the award of the Commission, has jurisdiction to review all the evidence for the purpose of determining whether as a matter of law there was any evidence tending to support the finding by the Commission. West v. Fertilizer Co., 201 N.C. 556."
The following question and answer were excepted to and assigned as error: "I know that Bolick was with the company. I saw the men in the McDowell space Sunday morning somewhere around 10 or 11 o'clock. I saw Mr. Bolick. I think it was around 11 o'clock when he left the building. Q. I believe, Mr. Casey, that these gentlemen from the McDowell Furniture Company had you to employ a couple of men to assist them there, is that so? Objection; overruled; exception. Ans.: Yes, sir, his representatives. Mr. Bolick asked for men and they were sent to the space." This objection was assigned as error on appeal and overruled. We think this evidence incompetent, and it should have been excluded.
It is said in Hunsucker v. Corbitt, 187 N.C. 496 (503), citing a wealth of authorities: "`Admissions by agents, made while doing acts within the scope of the agency, and relating to the business in hand, are admissible against the principal when such admissions may be deemed a part of the res gestae, but such admissions are not admissible to prove the agency; the agency must be shown aliunde before the agent's admissions will be received.' Lockhart's Handbook on Evidence, sec. 154." Jackson v. Tel.Co., 139 N.C. 347 (351). *Page 111 
Of course the answer exculpated all but Bolick, so the matter became immaterial. Much of the evidence objected to by defendant and for which assignments of error are made, we think not germane and immaterial.
On the whole evidence, we do not think that the death of Wesley Williams was such as set forth in the statute "arising out of and in the course of the employment."
In Smith v. Sink, 211 N.C. 725 (727), Stacy, C. J., speaking to the subject for the Court, says: "When all the evidence, taken in its most favorable light for the plaintiff, fails to show any actionable negligence on the part of the defendant (citing numerous authorities). `It all comes to this, that there must be legal evidence of the fact in issue and not merely such as raises a suspicion or conjecture in regard to it.' Walker,J., in S. v. Prince, 182 N.C. 788."
In Ridout v. Rose's Stores, Inc., 205 N.C. 423 (425), it is said: "It is obvious that from Saturday night until Monday morning the relation of employer and employee was suspended, and that there was no causal relation between the employment and the accident. Canter v. Board of Education,201 N.C. 836; Dependents of Phifer v. Dairy, 200 N.C. 65. It follows that the death of the employees did not arise out of and in the course of their employment."
In Jones v. Trust Co., 206 N.C. 214 (219), we find: "The facts found by the hearing Commissioner and approved by the Full Commission: `The plaintiff, on 29 October, 1931, while regularly employed by the defendant Planters National Bank and Trust Company, sustained an injury by accident as a result of an automobile wreck which occurred while he was en route to attend a meeting of the cotton committee for the purpose of procuring financial information for the use of the bank. The accident arose out of and in the course of the plaintiff's employment.' . . . (p. 220): We think the evidence was sufficient to sustain the finding of fact by the Industrial Commission and approved by the court below, that plaintiff on the trip when he sustained the injury `while he was en route to attend a meeting of the cotton committee for the purpose of procuring financial information for the use of the bank.'"
The facts here indicate, from all the evidence, that Wesley Williams was not about his employer's business when he was killed in an automobile accident. His regular work ceased at 12 o'clock on Saturday, 18 July, 1936. He could work overtime, for which he received extra pay. At first he declined the invitation to visit the furniture exhibition at High Point, as he had a date with his girl. He changed his mind, put on his Sunday clothes and went. He did not work for his employer on the trip and he was not compelled to go. *Page 112 
Pertinent facts: Wesley Williams was a foreman of the glue room. Looking at other exhibits of furniture at High Point could gain him no ideas to further his employer's business. In fact, Bolick did not call upon Wesley Williams, but obtained two men from the exhibition organization to help him assemble the McDowell Furniture Company's exhibit. Bolick paid the "boys'" expenses to give them "a little outing." Williams was doubtful about going when Bolick "told him I would like for him to go," and Bolick did not know he was going until he saw him in High Point. Williams worked by the hour, his week began Monday morning and ended at 12 o'clock on Saturday — 45 hours a week. He was not taken to High Point to work and no pay was allowed. No order was given him. Only "a courtesy to the folks at the plant." Bolick paid the hotel bill, but Williams returned it before he left by giving Bolick $5.00. He said, "There is my hotel expenses." The McDowell Furniture Company always gave Bolick an expense check when he went off on trips, and he used that to pay the hotel expenses, but did not pay for all the meals. It was not a part of Williams' employment that he should attend the furniture show. "The only reason he went this time was merely for his personal pleasure." Williams left with those he came with, at 2 o'clock Sunday afternoon, before Bolick left. E. C. Terry's testimony was to the effect: "I did not receive any extra pay for the time that I was away from Marion going on that trip." We were going on "merely an outing." "Didn't go there to do any work. All of us put on our Sunday-go-to-meeting clothes and weren't in working clothes. I was not under the direction of anybody."
B. T. Ragan's testimony was to the effect: That Bolick said "all of us who wanted to go they'd be glad for us to go along," that expenses would be paid. Williams said he didn't believe he would go, he "had a date with his girl." Left about 12:30 for High Point and Williams went. "I know that Wesley Williams wasn't under any orders to go and come at any particular time." "Was going merely on a pleasure trip and not to do any work, and that was the purpose of all." No working clothes taken.
The testimony of Clifton Byrd, left in charge of the glue room, that he and others worked overtime on "special order" and got paid for the work, is immaterial and of no probative force.
Fred Mathis' testimony was to the effect that he worked overtime in the glue room and Wesley Williams left for High Point at 12:25 and Bolick asked him to go. "Said he did not know whether he would go as he had a date with his girl that afternoon."
We have set forth the evidence fully and with care, and we cannot say that there was any sufficient competent evidence to sustain plaintiff's claim. The trip was an "outing," not to further directly or indirectly *Page 113 
the employer's business. The evidence in the case indicated that Wesley Williams was a volunteer in making the trip and that the trip was for pleasure and not for business. We think this case distinguishable from the case of Foster v. Culpepper Sales Service Co., Inc., Opinions Industrial Commission of Virginia (February, 1937), Vol. 18, No. 12, p. 364.
It was an unfortunate and deplorable accident. The party on the return trip to Marion was being driven by Wesley Williams. The rear tire blew out, the car turned over, and Williams was killed. The car belonged to E. C. Terry and not to defendant company.
For the reasons given, the judgment of the court below is
Reversed.
WINBORNE, J., took no part in the consideration or decision of this case.